403 So.2d 13 (1981)
BENSON & GOLD CHEVROLET, INC.
v.
The LOUISIANA MOTOR VEHICLE COMMISSION et al.
No. 81-CA-0286.
Supreme Court of Louisiana.
June 22, 1981.
Rehearings Denied September 18, 1981.
*14 William J. Guste, Jr., Atty. Gen., Kendall L. Vick, John R. Flowers, Jr., Lois C. Davis, Asst. Attys. Gen., David R. M. Williams, Staff Atty., Edwin A. Stoutz, Jr., New Orleans, Oscar W. Boswell, II, Reggie, Harrington & Boswell, Crowley, for defendant-appellant.
*15 Michael F. Little, William Wright, Jr., Jerome Reso, Jr., Monica T. Surprenant, Baldwin & Haspel, New Orleans, for intervenor-appellant.
Herschel C. Adcock, Adcock, Dupree & Shows, Baton Rouge, for intervenor-appellee.
Russ M. Herman, Maury A. Herman, Herman & Herman, New Orleans, for plaintiff-appellee.
DIXON, Chief Justice.
The record in this case discloses the following facts:
Benson & Gold Chevrolet, Inc., a Louisiana corporation, purchased the assets of an existing Chevrolet dealership in November, 1978. The business location of the dealership was in downtown New Orleans, in Orleans Parish. At the same time, Benson & Gold entered into a conditional franchise agreement with the Chevrolet Division of General Motors Corporation. The franchise contract included an ancillary agreement requiring Benson & Gold to relocate its newly acquired business to a site "in the vicinity of the intersection of Williams Boulevard and 35th Street," which is in Jefferson Parish. Since at least 1974, Chevrolet had recommended that another Chevrolet dealership be added to this burgeoning area of metropolitan New Orleans; the opportunity to implement this recommendation was seized when Benson & Gold acquired its franchise. The relocation was required to be completed no later than October 31, 1980.
Benson & Gold was duly issued a license to operate an automobile dealership by the appropriate state agency, the Louisiana Motor Vehicle Commission (M.V.C.).
Subsequently, Benson & Gold began considering sites for the future relocation. An option to purchase property at 2800 Veterans Memorial Boulevard was obtained in October, 1979. Chevrolet approved the site. The M.V.C. was notified, and a meeting was held that year to determine whether Benson & Gold should be issued a new license to operate its business at the proposed site of relocation.
At this point it is pertinent to note that another Chevrolet dealership, Bryan Chevrolet, Inc., was already located at 8200 Airline Highway, within about 2.5 miles of Benson & Gold's proposed location. Bryan Chevrolet had been doing business in the same site for more than twenty yearsthe only Chevrolet dealer on the East Bank of Jefferson Parish. James Bryan, the president and major shareholder of Bryan Chevrolet, objected to the establishment of another Chevrolet dealership within the immediate vicinity of his own business. Mr. Bryan is also a member of the M.V.C. He recused himself from the proceedings relating to Benson & Gold's application, although he continued to oppose the application through an intervention.
On January 11, 1980 the M.V.C. formally denied Benson & Gold's application for a new license at the proposed site in Jefferson Parish. The written notice of the denial indicated that the members of the M.V.C. had concluded that "it would not be in the public interest to license a new Chevrolet dealership in such close proximity to a presently existing Chevrolet dealership." The written notice goes on to state:
"The Commission determined that the licensing of two dealers to compete in sales and service of the same make motor vehicles in such close proximity to each other, and within the same general market area, is potentially destructive of [the] economic well being of both dealers and thus ultimately of the public interest and welfare, which requires the maintenance of healthy competition, productive of stable and long lasting automotive dealership businesses.
Additionally the Commission was not convinced that the existing Chevrolet dealer doing business in the community or territory concerned is not furnishing its manufacturer adequate representation."
Pursuant to R.S. 32:1256, Benson & Gold requested a hearing to review the M.V.C.'s denial of its application. The hearing was held in January and February of 1980, and concluded with a ratification and readoption of the initial denial.
*16 Benson & Gold appealed the M.V.C.'s decision to the district court for a trial de novo of the issues, as authorized by R.S. 32:1256(E). Bryan Chevrolet intervened, contending that the M.V.C. had decided the matter correctly. Trial began in June, 1980, and lasted more than twenty days. At the conclusion of the trial, judgment was rendered in favor of Benson & Gold. The trial court's reasons for judgment contain the following conclusions: (1) the M.V.C. misapplied the pertinent law governing relocations of licensed dealerships; (2) R.S. 32:1254(E) is unconstitutional, in that it arbitrarily and discriminatorily requires a new license to be issued when a dealership is moved from one parish to another, but does not require a new license when relocations are made within the same parish; (3) the regulatory scheme which the M.V.C. administers, R.S. 32:1251 et seq., is violative of the Sherman Anti-Trust Act (15 U.S.C. § 1 et seq.) in that it is a "restraint of trade" not within the "state action exemption;" and (4) the composition of the M.V.C., as governed by R.S. 32:1253(A), violates the equal protection and due process clauses of the federal and state constitutions.
Because portions of two state statutes were declared unconstitutional by the trial court, an appeal was taken directly to this court under the authority of Article 5, § 5(D)(1) of the Louisiana Constitution of 1974. Since this is an appeal from an adjudication by an administrative agency, the provisions of Louisiana's Administrative Procedure Act are applicable. See R.S. 49:951 et seq.
On appeal, the M.V.C. argues that the trial court's decision was wrong in every respect. Before considering the issues, however, a review of the legislative background is appropriate.

Legislative Background
Chapter 6 of Title 32 of the Louisiana Revised Statutes, entitled "Distribution and Sale of Motor Vehicles" and comprised of §§ 1251-59, was originally enacted in 1954. Acts 1954, No. 350, § 1. The legislation was drafted in response to a growing concern, nationwide, over automobile dealers' vulnerability to unfair practices perpetrated by automobile manufacturers. Automobile dealers were thought to be the "economic dependents of the company whose cars they sell," subject to unscrupulous practices by automobile producers. Ford Motor Co. v. United States, 335 U.S. 303, 323, 69 S.Ct. 93, 103, 93 L.Ed. 24, 38 (1948) (Black, J., dissenting). By 1957 at least nineteen states had enacted statutes attempting to regulate the manufacturer-dealer relationship. Brown & Conwill, "Automobile Manufacturer-Dealer Legislation," 57 Colum.L.Rev. 219 (1957). Federal legislation was also enacted at that time. See 15 U.S.C. §§ 1221-25. Federal lawmakers recognized that legislation was required "to remedy the manifest disparity in the ability of franchised dealers of automotive vehicles to bargain with their manufacturers." 1956 U.S. Code Cong. & Ad. News 4596, 4597. See also New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).
Although the legislative history of Louisiana's statutory scheme has not been documented, there is little doubt that Louisiana lawmakers were prompted by the same considerations that motivated lawmakers in other states to pass legislation protecting automobile dealers from unfair and oppressive practices of manufacturers. Simply stated, the purpose of the law was "to furnish the dealer with some protection against unfair treatment by the manufacturer." Forest Home Dodge, Inc. v. Karns, 29 Wis.2d 78, 85, 138 N.W.2d 214, 218 (1965). The legislative purpose of providing automobile dealers with some safeguards in their transactions with automobile manufacturers is clearly evidenced by the regulatory scheme itself. R.S. 32:1251, a declaration of public policy, is a reflection of the legislative concern:
"The legislature finds and declares that the distribution and sale of motor vehicles in the state of Louisiana vitally affects the general economy of the state and the public interest and the public welfare, *17 and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license motor vehicle manufacturers, distributors, and dealers doing business in Louisiana, in order to prevent frauds, impositions, and other abuses upon its citizens, and avoid undue control of the independent motor vehicle dealer by the motor vehicle manufacturing and distributive organizations and foster and keep alive vigorous and healthy competition, by prohibiting unfair practices by which fair and honest competition is destroyed or prevented, and to protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare, to prevent the practice of requiring the buying of special features, appliances and equipment not desired or requested by the purchaser, to prevent false and misleading advertising, to prevent unfair practices by motor vehicle dealers, manufacturers and distributing organizations, to promote the public safety and prevent disruption of the system of distribution of motor vehicles to the public and prevent deterioration of facilities for servicing motor vehicles and keeping same safe and properly functioning, and prevent bankrupting of motor vehicle dealers, who might otherwise be caused to fail because of such unfair practices and competition, thereby resulting in unemployment, disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression."
In the spirit of this policy, the legislature created an eight member Motor Vehicle Commission, empowered to regulate the automobile industry in order to prevent frauds and abuses upon the citizens of Louisiana by automobile dealers and manufacturers, and to forestall undue control and unfair trade practices imposed upon dealers by manufacturers. The commission is entirely composed of Louisiana residents, appointed by the Governor, who have been "actually engaged in the manufacture, distribution or sale of motor vehicles in the state of Louisiana for not less than five consecutive years" in the period preceding the appointment. R.S. 32:1253(A). The legislature granted the M.V.C. all of the powers necessary to carry out the provisions and objects of the law which it administers. R.S. 32:1253(E).
The heart of the regulatory scheme is contained in R.S. 32:1254, which requires all automobile dealers to be licensed by the M.V.C. In addition, the statute makes it a misdemeanor offense for automobile dealers to engage in certain sorts of practices with the public, and for automobile manufacturers to engage in certain sorts of conduct in their transactions with automobile dealers. R.S. 32:1254(A). For example, the statute forbids false or misleading advertisement; it prohibits automobile dealers from representing demonstrator models as "new and unused;" and it proscribes the unfair cancellation of dealers' franchises by manufacturers, as well as the use of the threat of cancellation as an instrument of coercion. Cf. Forest Home Dodge, Inc. v. Karns, supra.
This court has observed before that "the production, transportation and marketing of automobiles is unquestionably a proper subject of regulation by the Legislature under its police power." Louisiana Motor Vehicle Commission v. The Wheeling Frenchman, 235 La. 332, 344, 103 So.2d 464, 469 (1958). The regulation of automobile distribution industry is a matter of importance to the public interest, and the parties to this suit do not argue otherwise. What the parties do question, and what this court must decide, is: whether the M.V.C. properly denied Benson & Gold's application for a new license; and whether certain portions of the regulatory law are in violation of constitutional and statutory provisions.

Application of the Regulatory Scheme
In order for an automobile dealer to obtain a license from the M.V.C., certain standards must be met under the terms of *18 § 1254(B).[1] For example, the license application must contain "information relating to the applicant's financial standing, the applicant's business integrity, whether the applicant has an established place of business and is primarily engaged in the pursuit, avocation, or business for which a license" application is made, as well as "such other pertinent information consistent with the safeguarding of the public interest and public welfare." R.S. 32:1254(B). In addition, the applicant must provide a copy of the franchise agreement with the manufacturer or distributor, together with satisfactory evidence that adequate space can be provided for the display of automobiles and that adequate facilities will be available for repairs and service. These qualifications obviously relate to the dealer's capacity to afford honest, fair and competent service to the public.
Benson & Gold, having met the above standards, was issued a license by the M.V.C. in 1978. When the M.V.C. denied the application of Benson & Gold for a new license in 1980, it issued "findings of fact" and "conclusions of law" in support of its determination. R.S. 49:958. The latter "conclusions" comprise the M.V.C.'s understanding of the relevant legislation which it administers, as applied to the facts of this case. These conclusions can be grouped into two basic categories. First, the M.V.C. determined that a new license was required whenever a dealer relocated to another parish. If the applicant proposed to relocate to a site within the same "community" or "territory" as another same make dealer, the applicant was required to show that the existing dealer had not furnished "adequate representation" to the particular manufacturer. It was then concluded that Benson & Gold had failed to prove that Bryan Chevrolet had not been providing "adequate representation" of Chevrolet automobiles within the pertinent area. Second, the M.V.C. determined that it was empowered to consider all factors bearing on the public interest. It then found that the licensing of two Chevrolet dealerships "in such close proximity" would be economically disadvantageous to both, thereby undermining the welfare of the general public. Ultimately, it is evident that the M.V.C.'s decision rested upon its perception that the location of two same make dealerships 2.5 miles from each other would be potentially destructive of one or both of the dealers, a disservice to the public interest and welfare.
These two grounds for the M.V.C.'s decision will be treated separately.

"Adequacy of Representation"
In its conclusions of law, the M.V.C. made reference to § 1254(E), which states in part:
"The license issued to each motor vehicle dealer ... shall specify the location of the ... office or branch thereof. In case such location ... is changed, the commission shall endorse the change of location... on the license without charge if it be within the same parish. A change of location to another parish ... shall require a new license." (Emphasis added). (Amended by Acts 1976, No. 119, § 1).
Since Benson & Gold proposed to move from Orleans Parish to Jefferson Parish, the M.V.C. required the issuance of a new license. Fresh consideration was then given to the requirements of § 1254(B), regarding the standards an applicant must meet to obtain a license.
As a matter of statutory construction, the M.V.C. misapplied § 1254(E). The language in the paragraph clearly states that the commission "shall endorse the change of location" (emphasis added) on the license. The only exception is that, if the dealer is moving from one parish to another, a new license must be obtained and fees paid therefor. The two preceding paragraphs of the statute respectively treat the schedule of license fees and the penalties for failing to apply for a license as required. When these three paragraphs are read in pari materia, it is clear that the new license requirement of paragraph (E) does nothing more than impose an obligation to pay an *19 additional set of fees for a new license upon an applicant who wishes to move from one parish to another. The provision has nothing at all to do with the applicant's qualifications for a license, which the M.V.C. is free to review at any time. Simply as a matter of statutory interpretation, then, the M.V.C.'s preliminary reliance upon § 1254(E) was misplaced. And, since no complaint is made by Benson & Gold of the additional fees that it must pay for a new license under this provision, it is unnecessary to consider the provision's constitutionality.
The proper point of beginning in this matter is § 1255, which specifically provides for license applications:
"The commission may deny an application for a license, or revoke or suspend a license after it has been granted, for any of the following reasons:
(1) On satisfactory proof of unfitness of the applicant or the licensee, as the case may be, under the standards established and set out in this Chapter.
(2) For fraud practiced or any material misstatement made by an applicant in any application for license under the provisions of this Chapter.
(3) For any willful failure to comply with any provision of this Chapter or with any rule or regulation adopted and promulgated by the commission under authority vested in it by this Chapter.
(4) Change of condition after license is granted or failure to maintain the qualifications for license.
(5) Continued or flagrant violation of any of the rules or regulations of the commission.
(6) For any willful violation of any law relating to the sale, distribution or financing of motor vehicles."
In referring to "the standards established and set out in this Chapter," paragraph (1) of § 1255 obviously incorporates the standards contained in § 1254(B). It should be noted that the M.V.C., in its "findings of fact," negatived each and every ground for disqualification contained in § 1255, except for paragraph (4), dealing with a "change of condition after [a] license is granted." Although this consideration was not specifically mentioned in the M.V.C.'s "conclusions of law," it must be inferred that the M.V.C. concluded that Benson & Gold's proposed "change of condition" was a proper basis for denying the application, in that it altered Benson & Gold's qualifications under the standards established by law. In all other respects, the M.V.C. explicitly admitted that the Benson & Gold dealership had maintained the qualifications for a license.
Only one exception was found with regard to Benson & Gold's qualifications under § 1254(B). The statute contains a significant proviso:
"... provided, that if the applicant was not duly licensed as a motor vehicle dealer under the provisions of this Chapter for the year immediately prior to the year as to which license is applied for, the applicant must also furnish satisfactory evidence that the existing licensed motor vehicle dealer or dealers doing business in the community or territory concerned have not furnished the particular manufacturer adequate representation in such community or territory."
It is this proviso that is at the core of the dispute. The proviso does not apply to Benson & Gold. Benson & Gold had been duly licensed as an automobile dealer in the year preceding its application. Only new applicants for licenses must show the failure of existing dealerships to serve the manufacturer. No doubt realizing this, the M.V.C. cited language in § 1254(B) which requires production of "such other pertinent information consistent with the safeguarding of the public interest and public welfare." From this general language the M.V.C. reasoned that the proviso's requirement had been imposed by the legislature to safeguard the public interest; and, since the M.V.C. was authorized to consider all information relating to the public interest, it concluded that it was entitled to impose the proviso's requirement upon Benson & Gold. This approach is not sound.
By its unambiguous terms, the proviso is directed toward regulating the situation *20 where an applicant wishes to start a new business (or, at least, a business not licensed the year before) in the same community or territory as an existing, same make dealership; it is not directed toward same make dealerships already in existence that propose to relocate. The two situations are obviously not the same: it can be inferred that the legislative concern was with the overloading of a market area when a manufacturer franchised a new entry into the business, in direct competition with an existing dealer. Depending upon the manufacturer's conduct in regard to the two dealers, the fresh competition might virtually destroy the older franchisee. In this manner, the manufacturer could accomplish by indirection that which the law directly prohibits: the unfair termination of a dealer's franchise. The legislature expressly stated its concern over this practice. See R.S. 32:1254(A)(4)(c). Cf. Wis.Stat. § 218.01(3)(f).
However, the statute simply does not evince a legislative concern with the consequences that might result when an existing dealership, doing business in the same market area as another, same make dealership, moves its business location to a point nearer the other dealer. In these circumstances, the relocation of the same make dealer might intensify the competition between the two dealerships, but it would not create competition where none had existed before. The legislature expressed its interest in regulating the latter situation, not the former. The proviso's requirement is perfectly coextensive with the practical problem that might arise should an automobile manufacturer franchise a new dealer to be in direct competition with an existing dealership that had previously faced no such competition within its own market area.
The proviso should not have been expanded beyond its own terms:
"... it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see. That is for the legislature to judge unless the case is very clear." Keokee Consol. Coke Co. v. Taylor, 234 U.S. 224, 227, 34 S.Ct. 856, 857, 58 L.Ed. 1288, 1290 (1914).
Although a regulatory agency is entitled to a certain amount of hegemony over the statutes it is entrusted to administer, it cannot go too far afield from the letter of the law even if it perceives that it is furthering the law's spirit. While the jurisprudence of this state has not frequently treated matters of administrative law, the principle is well established that an administrative agency must act in conformity with its statutory authority, which it cannot exceed. See, e. g., Charbonnet v. Board of Architectural Examiners, 205 La. 232, 17 So.2d 261 (1944); Realty Mart, Inc. v. Louisiana Board of Tax Appeals, 336 So.2d 52 (La. App. 1st Cir. 1976); Pearce v. Kramer, 128 So.2d 304 (La.App.3d Cir. 1961); Hunter v. Hussey, 90 So.2d 429 (La.App. 1st Cir. 1956); Kramer v. State Board of Veterinary Medical Examiners, 55 So.2d 93 (La. App. 1st Cir. 1951). The M.V.C. was not entitled to impose a restriction upon Benson & Gold when the statutes themselves failed to provide such a restriction.
This conclusion is bolstered by the fact that the legislature, in its 1980 session, amended R.S. 32:1254(B) specifically to provide standards for reviewing the application of a dealer to relocate an existing dealership to a site within five miles of another, same make dealer. See Acts 1980, No. 672, § 1. This was the first substantial alteration of the statute since its inception, and was no doubt enacted because the legislature perceived that the lacuna in the law invited problems of the sort that this case presents. At least eighteen other states have passed specific legislation dealing with such intrabrand competition. See New Motor Vehicle Bd. v. Orrin W. Fox Co., supra, n. 7 and accompanying text. However foresighted the M.V.C. might have been in discerning legislative changes, it was without authority to anticipate those changes and incorporate them into its guidelines.
*21 The applicant, Benson & Gold, had a right to rely upon the law as it was written when the application was made. At that time, nothing in the statutes inhibited a licensed automobile dealership from relocating to an area closer to another dealer selling automobiles of the same make. The M.V.C. overreached its legislative mandate in applying the proviso in § 1254(B) to Benson & Gold.

"Public Interest and Welfare"
The second, more nebulous ground for the M.V.C.'s refusal to grant Benson & Gold the requested license was that "the licensing of two Chevrolet dealers to compete in the same market area in such close proximity" would be "potentially destructive to the economic vitality of both dealers and the interest of the general public," which was thought to be "best served by healthy competition which produces stable, long lasting automotive dealerships." In short, the M.V.C. determined that the entry of Benson & Gold into the same geographical area of metropolitan New Orleans as Bryan Chevrolet would be financially ruinous of one or both dealerships.
As noted, the M.V.C. is authorized to consider any information that relates to the public interest and welfare when it evaluates an application for a license. The public policy underlying the regulatory legislation which the M.V.C. administers was partly concerned with prevention of the "inevitable train of undesirable consequences, including economic depression," that might result when an automobile dealer failed because of "unfair practices and competition." R.S. 32:1251. Another stated purpose of the law was to "foster and keep alive vigorous and healthy competition, by prohibiting unfair practices by which fair and honest competition is destroyed or prevented ..." R.S. 32:1251.
While we do not dispute the M.V.C.'s basic finding of factthat the relocation of Benson & Gold could be financially harmful to one or both of the dealersit is necessary to determine whether this consideration forms part of the fabric of the public interest and welfare which the M.V.C. is empowered to safeguard. To begin, the M.V.C.'s voiced concern over the financial future of Benson & Gold has little logic to recommend it. Benson & Gold chose to accept Chevrolet's relocation requirement precisely because such a move, in its estimation, would bring financial rewards. Whether the decision was a prudent one, and whether it will produce the anticipated benefits, are matters at the risk of Benson & Gold. Benson & Gold does not complain that the competition which will result from its relocation will be unhealthy, dishonest, or the product of unfair practices. Indeed, if officers of Benson & Gold believed that the consequences of relocation would be ruinous, it is unrealistic to believe that Chevrolet could have induced them to enter the franchise agreement. From the standpoint of Benson & Gold, then, the decision of the M.V.C. does nothing to promote franchising equity or advance the public interest. See discussion by Mashaw, "Constitutional Deregulation: Notes Toward a Public, Public Law," 54 Tul.L.Rev. 849 (1980).
When Benson & Gold is eliminated as the object of legislative solicitude in this matter, the motivating factor underlying the license denial becomes clear: the M.V.C. determined that Bryan Chevrolet would be financially harmed should it have to face more intense competition from a nearby, same make dealership. It was entirely proper for the M.V.C. to consider this factor. The declaration of public policy contained in R.S. 32:1251 specifically mentions the prevention of bankruptcy, with its attendant economic harms, as one of the goals of the regulatory legislation. However, the law does not contemplate that no automobile dealers will become bankrupt under the protection of regulation, nor does it anticipate that all automobile dealerships will attain equal financial success: the law expressly states that it is the bankrupting of dealers because of unfair practices and competition that is undesirable. Throughout § 1251, the expression "unfair practices" is used. The statute states that it is the purpose of the law to "foster and keep alive vigorous and healthy competition, by prohibiting *22 unfair practices by which fair and honest competition is destroyed or prevented..." (Emphasis added). The purpose of the M.V.C. is not to keep every automobile dealership in Louisiana secure from financial loss, however desirable a prospect that may be; it is to prevent the unfair practices by which financial loss occurs. If a dealership's profits are reduced because of "vigorous and healthy competition" from another dealership, that is both "fair" and "honest," the M.V.C. is powerless to interpose its authority. Indeed, it is the M.V. C.'s mission to foster such competition.
In the present case, neither the M.V.C.'s findings of fact nor its conclusions of law even allude to any suspicion that Benson & Gold's proposed relocation is an unfair practice perpetrated by Chevrolet. The findings of fact do indicate that Bryan Chevrolet was offered an opportunity to relocate to the Veterans Boulevard area several times during a period of four years. Bryan, however, was unable to meet the conditions imposed by Chevrolet. And, although the record does reflect that Benson & Gold was offered more generous terms in relocating than was Bryan Chevrolet, nothing indicates that this was an unfair practice. In addition, mention is made of the fact that Bryan Chevrolet expanded its facilities in 1976, but was never expressly notified of Chevrolet's intent to place another dealership in the Kenner-Metairie area. Again, however, this recital of fact is unaccompanied by any indication that Chevrolet was engaged in any sort of deliberate deception aimed at undermining the business of Bryan Chevrolet. In fact, the record indicates that Chevrolet had advised Bryan, at least as early as 1970, that it planned to relocate one of the dealerships in downtown New Orleans to the Kenner-Metairie area. Notwithstanding the fact that the M.V.C. may have been accurate in predicting that Bryan Chevrolet could be harmed by the relocation of Benson & Gold, the M.V.C. did not find that the relocation was unfair.
The principle that courts are the ultimate arbiters of the law has been entrenched in the American legal system since Marbury v. Madison, 5 U.S. (1 Cranch) 60, 2 L.Ed. 60 (1803). And, although an administrative agency might have the first word in interpreting the law which it administers, the last word on statutory interpretation belongs to the courts:
"... Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute...." National Labor Relations Bd. v. Hearst Publications, 322 U.S. 111, 130-31, 64 S.Ct. 851, 860, 88 L.Ed. 1170, 1184 (1944).
The principle has been affirmed in decisions involving judicial review of administrative actions that are too numerous to cite. See, e. g., authorities collected in K. Davis, Administrative Law of the Seventies § 30.00 (1976); 4 K. Davis, Administrative Law Treatise § 30.12 (1st ed. 1958); 5 Mezines, Stein & Gruff, Administrative Law § 51.01 (1980). The principle is itself embodied in the relevant laws which govern this court's review of administrative adjudications. R.S. 49:964(G). See also R.S. 32:1256(E).
The M.V.C. was correct in determining that its authority to evaluate all considerations involving "public interest and public welfare," established in R.S. 32:1254(B), entitled it to refer to the public policy articulated by the legislature in R.S. 32:1251. However, the M.V.C. incorrectly interpreted that law as giving it a mandate to deny a license application whenever the issuance of such a license could have a harmful financial effect upon an already established dealership. As interpreted by this court, R.S. 32:1251 simply gives the M.V.C. the authority to prevent unfair practices, frauds, abuses, undue control by manufacturers and the like. Without a finding that Benson & Gold's relocation constitutes such an unfair practice, the M.V.C.'s determination that a denial of the license was in "the public interest" is baseless.
When an administrative agency such as the M.V.C. denies an application for *23 a license, it is governed by the same provisions in the law that relate to "adjudications." R.S. 49:961(A). When an administrative adjudication is judicially reviewed, the courts are empowered to reverse or modify any decision by an agency that violates constitutional or statutory provisions, exceeds the agency's delegated authority, or is affected by "other error of law." R.S. 49:964(G). In addition, R.S. 32:1256(E) specifically provides that a court reviewing an action taken by the M.V.C. "shall enter such order with respect thereto as it shall deem just and equitable." We find, consistent with the trial court's decision, that the M.V. C.'s denial of the license application was based upon an erroneous construction of the law; we further hold that, when an applicant meets the general standards established by law, the application may be denied on the grounds of "public interest and public welfare" only if an unfair practice or a "disruption of the system of distribution of motor vehicles to the public" are involved. Since the M.V.C. found that the conditions of R.S. 32:1254(B) had been satisfied by Benson & Gold, and because there is no evidence that the relocation is an unfair practice, Benson & Gold is entitled to be granted a license upon paying the license fees imposed by law. R.S. 32:1254(C), (E).

Constitutional and Anti-Trust Questions
Having decided the merits of the case in favor of Benson & Gold, the trial judge went further to declare that two provisions of the law were unconstitutional, and that the entire regulatory scheme did not constitute "state action" so as to be exempt from the provisions of the Sherman Anti-Trust Act, which it violated.
One statute which was declared unconstitutional was R.S. 32:1253(A), which governs the composition of the M.V.C. The trial court's determination was primarily based upon its conclusion that a regulatory agency comprised entirely of automobile dealers could not provide an impartial hearing to other automobile dealers. The fact that the automobile dealers might have a personal interest in the matters they are called upon to adjudicate was said to be a violation of due process. See, e. g., Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Wall v. American Optometric Association, Inc., 379 F.Supp. 175 (N.D.Ga.1974), affirmed, 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974). But see also Friedman v. Rogers, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979).
Because we affirm the trial court's initial determinationthat the denial of the license application was improperit is unnecessary to address the constitutionality of the statutes. It is a long standing judicial principle that courts will not consider constitutional challenges unless necessary to the resolution of a dispute. See, e. g., Orleans Parish School Board v. Williams, 312 So.2d 647 (La.1975); State in Interest of Toler, 262 La. 557, 263 So.2d 888 (1972); Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57 (1972); Aucoin v. Dunn, 255 La. 823, 233 So.2d 530 (1970); Doss v. Board of Commissioners of Mermentau Levee District, 117 La. 450, 41 So. 720 (1906); Parish of St. Landry v. Stout, 32 La.Ann. 1278 (1880).
The soundness of this principle is demonstrated by the circumstances of this case. The legislature substantially changed many of the provisions contained in R.S. 32:1251 et seq. See Acts 1980, No. 672, § 1. Specifically, § 1254(E) was amended so as to eliminate constitutional objections discussed by the district court. A decision upholding the constitutional objection to the former statute would be of little value: the parties would gain nothing in the way of relief beyond that which has already been granted, and there is apparently no other party who has claimed to have been aggrieved by the former law. We therefore vacate that part of the trial court's judgment which declared R.S. 32:1253(A) and R.S. 32:1254(E) unconstitutional.
The final aspect of the district court's decision which requires consideration is the holding that the regulatory scheme which the M.V.C. administers is violative of the Sherman Anti-Trust Act, 15 U.S.C. § 1, which states in part:

*24 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...."
The district court found that the provisions of the regulatory scheme which restrict an automobile dealership's right of relocation constituted a "restraint of trade" in violation of the antitrust laws.
In addition, the trial court found that Louisiana's regulatory scheme did not constitute "state action" so as to be exempt from the antitrust legislation.
The "state action" exemption has its origin in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In that decision, the United States Supreme Court, after examining the legislative history of the Sherman Act, found no indication that the act's provisions were "intended to restrain state action or official action directed by a state." 317 U.S. at 351, 63 S.Ct. at 313, 87 L.Ed. at 326. In effect, the court held that the Sherman Act did not apply to regulatory laws which were adopted and enforced by a state. The immunity granted by the Parker doctrine has been consistently applied over the years. See, e. g., California Liquor Dealers v. Midcal Aluminum, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); New Motor Vehicle Bd. v. Orrin W. Fox Co., supra; Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).
The most recent formulation of the Parker doctrine's "state action" exemption can be found in California Liquor Dealers v. Midcal Aluminum, supra, in which the United States Supreme Court, after reviewing the opinions cited above, stated:
"These decisions establish two standards for antitrust immunity under Parker v. Brown. First, the challenged restraint must be `one clearly articulated and affirmatively expressed as state policy'; second, the policy must be `actively supervised' by the State itself...." 445 U.S. at 105, 100 S.Ct. at 943, 63 L.Ed.2d at 243.
Consistent with this approach, we find that the policy of the State of Louisiana in enacting a program to regulate automobile dealerships has been clearly articulated and affirmatively expressed. See R.S. 32:1251. As has been explained above, that policy is to prevent the citizens of this state from being subjected to unfair practices perpetrated by automobile dealers and manufacturers, and to furnish automobile dealers with protection against unfair treatment by automobile manufacturers. The state policy could not be plainer, notwithstanding any defects in its legislative drafting.
We also find that the action taken by the M.V.C. clearly constitutes "active supervision" by the state itself in executing governmental policy. The trial court expressed some concern that: the M.V.C. has never independently determined the market area for any dealership; that it has never conducted studies of market conditions to discover instances of price fixing; that it has never made any follow-up determination to ascertain that a dealership's floor area or service facilities remain adequate; and that the M.V.C. has never suspended or revoked a dealership's license because of failure to maintain the qualifications for a license. While these considerations might be thought to indicate a certain laxity on the part of the M.V.C. in carrying out its statutory duties, we do not believe that this passivity in exercising its regulatory powers withdraws the M.V.C. from the state action exemption. Immunity from antitrust legislation is conditioned upon a state policy being actively supervised by the state itself, rather than by private parties. The decisions of the United States Supreme Court make it clear that the evil to be eliminated is that which occurs when essentially private interests claim immunity from antitrust legislation by inducing some involvement by the state in regulation which is basically protective of private interests. See, e. g., California Liquor Dealers v. Midcal *25 Aluminum, supra ("a gauzy cloak of state involvement over what is essentially a private price fixing arrangement"); Cantor v. Detroit Edison Co., supra ("state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity"); Goldfarb v. Virginia State Bar, supra ("it cannot fairly be said that the State of Virginia ... required the anticompetitive activities").
The fact that the M.V.C. may not be as active as some may wish does not affect its eligibility for this immunity; nor does the fact that the substantive provisions of the regulatory scheme may not always seem to harmonize with the public policy underlying the legislation obscure the clear purpose of the law. Sometime in the future the courts might be faced with a record of the failure of the M.V.C. to act as a state agency in effectuating the public policy announced in R.S. 32:1251. If it should be shown that the M.V.C. has become not a genuine agency of the state, but, instead, a shelter for the private economic interests of automobile dealers, it would forfeit its "state action" immunity from the antitrust laws. Such a showing has not been made.
Therefore, the actions taken by the M.V.C. pursuant to its duties under R.S. 32:1251 et seq. constitute "state action" for the purposes of immunity under the Sherman Anti-Trust Act.
The decision of the district court is affirmed only insofar as it held that the license application of Benson & Gold should have been granted by the M.V.C.; in all other respects, the judgment is vacated, as we have pretermitted discussion of the constitutionality of the affected statutes and have found that Louisiana's regulatory law governing automobile dealerships is exempt from the provisions of 15 U.S.C. § 1. All costs of these proceedings are taxed equally to the intervenor, Bryan Chevrolet, Inc., and the defendant, the Louisiana Motor Vehicle Commission.
DENNIS and WATSON, JJ., dissent and assign reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
To prevent automobile dealership proliferation, La. R.S. 32:1254(B) requires a person seeking to open a new dealership in a community to prove inadequate representation of a manufacturer by existing dealers. The majority interprets the statute so as to exempt from this requirement any person who held a license for a dealership anywhere in the state during the preceding year. In my opinion, the Motor Vehicle Commission's interpretation is reasonable and more in keeping with the legislative aim: any applicant who was not licensed in the community during the preceding year must prove the need for an additional dealership to provide adequate representation of his manufacturer.
The Commission reasonably found that, due to the nature of the thickly populated New Orleans area, North Rampart and 2800 Veterans are not located within the same community. The record is devoid of any proof that Bryan has failed to provide Chevrolet adequate representation within its Jefferson Parish community. Since there is warrant in the record and a reasonable basis in law for the regulatory agency's decision, it should not be overturned by this court.
WATSON, Justice, dissenting.
I respectfully dissent. The Motor Vehicle Commission (M.V.C.) acted within its authority when it denied Benson & Gold's application for a new license.
LSA-R.S. 32:1255 allows the M.V.C. to deny a license for a number of reasons The denial here was based on paragraph ), which refers to "[c]hange of condition after license is granted...." The move of Benson & Gold into the same geographical area of metropolitan New Orleans as Bryan Chevrolet is such a change of condition.
M.V.C. concluded that:
"To grant the license applied for would result in the licensing of two Chevrolet dealers to compete in the same market area in such close proximity as to be *26 potentially disruptive to the economic viability of both dealers and the interest of the general public which is best served by healthy competition which produces stable, long-lasting automotive dealerships."
The M.V.C.'s findings of fact support this conclusion: Benson & Gold's proposed new location is only 2.5 miles away from Bryan's pre-existing dealership. In 1978, Bryan had completed, with Chevrolet's consent and encouragement, an expansion of its facilities at a total cost of over $1,000,000. When Bryan was planning this expansion, it was not told of Chevrolet's plan to move another dealer into the Metairie-Kenner area.
The M.V.C. noted a similar situation involving two Ford dealerships in the same area. In 1979, Norton Ford was relocated from downtown New Orleans to Kenner, about five miles away from Metairie Ford in Metairie. In 1979, Metairie Ford experienced a 35% decrease in new car sales and a 23% decrease in new truck sales, while Ford sales in the New Orleans area had a 15.4% decrease in car sales and a 2.4% increase in truck sales. The distance between Bryan Chevrolet and the proposed Benson & Gold location is one-half that between Norton Ford and Metairie Ford. The M.V.C. was justified in concluding that two dealerships so close together would produce undesirable financial consequences.
The M.V.C.'s concern with economic harm to both dealers was a proper factor to be considered in reaching a decision on the license application. The "Declaration of Public Policy" in LSA-R.S. 32:1251 provides for regulation of the distribution and sale of motor vehicles in order to promote the public interest and welfare. Regulation of dealers is declared necessary for a number of reasons: to "foster and keep alive vigorous and healthy competition"; to "prevent unfair practices"; to "prevent disruption of the system of distribution of motor vehicles to the public and prevent deterioration of facilities for servicing motor vehicles"; and to "prevent bankrupting of motor vehicle dealers ... because of ... unfair practices and competition."
The M.V.C. concluded that economic harm would result to both dealers if the relocation were approved. Distribution of motor vehicles might be disrupted and deterioration of service facilities might also result. The M.V.C. found that the close proximity of the dealers would constitute unfair rather than healthy competition. The M.V.C. was justified in concluding that the relocation of Benson & Gold was not in the public interest, and in denying the license.
NOTES
[1] All references to statutes made in this opinion relate to the laws in effect at the time this dispute arose. The amendments made to certain statutes in 1980 are not applicable.