MOLAISON, J.
This appeal arises from an administrative proceeding before the Louisiana Motor Vehicle Commission ("the Commission"), which found that Elio Motors, Inc. was engaged in manufacturing recreational products and offering to sell them directly to consumers for over four years without a manufacturer's or a dealer's license and imposed civil penalties for the violations, including a $ 545,000 fine. La. R.S. 32:1251, et seq.
Elio sought judicial review of the Commission's decision in the district court, which affirmed the findings of violations and reduced the penalties. We affirm the findings of violations, reverse the district court's reduction of penalties and reinstate the penalties imposed by the Commission.
SUMMARY OF STANDARD OF REVIEW, KEY ISSUES AND EVIDENCE
Proceedings before the Commission are governed by the Louisiana Administrative Procedure Act, La. R.S. 49:950, et seq.[1] Pursuant to the standard of review set forth in Section 964(G), as discussed more fully below, we conduct an independent review of the record to determine whether the findings of statutory violations are factually and legally supported and whether the agency exceeded its authority or acted without a rational basis in imposing penalties.
Elio's vehicle, known as "the Elio," is an enclosed, three-wheeled passenger vehicle that is a cross between an automobile and a motorcycle. It is undisputed that the vehicle is a recreational product, as defined in the licensing law.[2] The dispute centers on whether Elio is a "manufacturer" or a *1137 "dealer" within the meaning of the licensing law.
The law defines a manufacturer as one who "fabricates, manufactures, or assembles" recreational products and a dealer as one who "buys, sells, ... offers, or attempts to negotiate a sale or exchange of an interest in recreational products and who is engaged wholly or in part in the business of buying and selling recreational products in the state of Louisiana." La. R.S. 32:1252(24), (46)(a). The statutory wording indicates that the activities for which licensing is required must occur in the present tense.
As set forth in more detail below, the licensing law is designed to promote public safety and to protect members of the public from physical or financial harm resulting from the distribution and sale of motor vehicles and recreational products by those who do business in this state. The statutes are penal in nature and must be strictly construed, but the statutory definitions are very general and contain very little specificity as to what types of activities are either included in or excluded from their scope. The statutes must be interpreted based on the generally prevailing meaning of their terms and on common sense. They should not be interpreted in a way that makes them ineffective or meaningless.
The Commission invoked the hearing after Elio leased space in the former General Motors manufacturing plant in Shreveport and collected almost $ 28 million in cash, in the form of refundable and non-refundable online reservations for its vehicle, over a four-year period without being licensed as a recreational products manufacturer or dealer. As of the hearing date, Elio had solicited and received more than 65,000 reservations and had not produced any vehicles for sale. While taking these reservations, Elio built at least one test vehicle and engaged other companies to produce prototype vehicles and a customized prototype engine, which Elio used for marketing and testing purposes.
Elio contends it will seek the appropriate Louisiana licenses in the future but claims it is not currently subject to the licensing requirements for recreational products manufacturers or dealers because the design of its vehicle has not been finalized and it has not yet produced any vehicles for sale or sold a vehicle. Elio claims the online reservation payments are for a "spot in line" to possibly purchase a vehicle at a later date, at a price to be agreed on in the future, rather than deposits toward the sale of a vehicle. Elio also asserts that it does not have a sufficient connection to Louisiana to support the imposition of penalties.
The evidence presented at the hearing, when viewed in its entirety, does not support Elio's claims. The evidence shows that, while soliciting and accepting online reservation payments in amounts ranging from $ 100 to $ 1,000 and listing a specific targeted base price for the vehicle, most recently $ 7,450, Elio has:
• Identified the online payments as "customer deposits" for the reservation of "an Elio vehicle";
• Described the online reservations as "pre-orders," "pre-production sales," and "binding purchase commitments";
• Offered a "locked in price" to non-refundable reservation holders who met certain conditions;
• Reported to the Securities and Exchange Commission that 88 percent of all reservation holders had received a "locked in price";
• Used as its toll-free telephone number, 844-BUY-ELIO;
• Described itself as a manufacturer on its website and in press releases;
*1138 • Leased space in the former General Motors manufacturing plant in Shreveport and mentioned its affiliation with the plant in numerous public communications, including the online reservations program and other fundraising and marketing efforts;
• Applied for a federal Advanced Technology Vehicles Manufacturing loan, available to manufacturers who re-equip, expand or establish manufacturing facilities in the United States that produce fuel-efficient advanced technology vehicles (ATVs) or qualifying components, or who perform engineering integration in the U.S. for ATVs or qualifying components;
• Announced the formation of engineering and supplier partnerships with other companies who would work with Elio to produce its vehicle;
• Engaged other companies to build, for Elio and at its direction, prototype vehicles and a customized prototype engine used by Elio to promote its vehicle at auto shows, on other tours around the country, and online; and
• Built at least one test vehicle under the direction of an Elio employee who had "taken countless vehicle programs through the manufacturing process for other automakers."
A more detailed discussion of the evidence appears below. Elio did, at times, say and do things that would suggest it does not fit within the statutory definitions at issue, but the overwhelming weight of the evidence places Elio within the scope of the definitions and substantiates Elio's ties to Louisiana.
REGULATORY SCHEME
In order to provide some context for our discussion of the issues presented, we first consider the purpose and scope of the Commission's regulatory authority, as set forth in the Louisiana Motor Vehicle Commission Law. The legislature's Declaration of Public Policy appears in La. R.S. 32:1251, which states in relevant part that the law was enacted based on the legislature's findings that
the distribution and sale of motor vehicles and recreational products in the state of Louisiana vitally affects the general economy of the state, the public interest, and the public welfare, and that in order to promote the public interest, and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license those persons enumerated in R.S. 32:1254 and doing business in Louisiana in order to prevent frauds, impositions, and other abuses upon its citizens , ... and to protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare, ... to prevent unfair practices by said licensees, to promote the public safety and prevent disruption of the system of distribution of motor vehicles and recreational products to the public and prevent deterioration of facilities for servicing motor vehicles and keeping same safe and properly functioning[.] ...[3]
(Emphasis added.)
The scope of the Motor Vehicle Commission's authority includes evaluating the financial standing and business integrity of all license applicants and holders, as well as their ability to properly conduct business, the effect of licensing on the applicant's business and the consuming public, *1139 and "such other pertinent information consistent with the safeguarding of the public interest and public welfare." La. R.S. 32:1254(C)(2), (C)(8), (D)(1), (D)(5), (E)(1), (E)(8). See and compare Louisiana Motor Vehicle Commission v. Wheeling Frenchman , 235 La. 332, 103 So.2d 464, 466-67, 469 (1958) and Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission , 403 So.2d 13, 18 (La. 1981).
FACTS AND PROCEDURAL BACKGROUND
The evidence introduced at the hearing shows that Elio Motors is an Arizona corporation authorized to do business in Louisiana and has publicly described itself as a "start-up vehicle manufacturer." In 2013, Elio announced that it had leased space in the former General Motors plant in Shreveport and would use the plant to produce a low-cost, high mileage, three-wheeled enclosed passenger vehicle called "the Elio," with two front wheels, one rear wheel, a driver's seat in front and a passenger seat in the rear.[4] The Elio has many of the same features as traditional passenger cars but is designed to be smaller and lighter, with an estimated fuel efficiency of 84 miles per gallon and a target retail price of $ 7,450. We refer to the Elio vehicle as "the vehicle" to avoid confusion with the company name and the name of its founder and CEO, Paul Elio.
Elio has expressed its commitment to build the vehicle in America, with American workers. Elio listed the Shreveport plant as its principal place of business in its application for authority to do business in Louisiana and does not have a plant anywhere else. Elio initially estimated that commercial mass production would begin at the Shreveport plant in 2015, but later changed the date several times, first to 2016, then to 2017, and then to 2018. As of the hearing date in July 2017, Elio had not begun commercial mass production of the vehicle.
Elio began soliciting online reservations for its vehicle in 2013 and had received more than 65,000 reservations by the time of the hearing. During that time, Elio has been engaged in extensive design, research and development, marketing and fundraising activities relating to the vehicle, as discussed below. The company has raised capital from a number of sources, including loans, advances from its directors and stockholders, the public sale of its corporate stock, an equity crowdfunding investment campaign governed by federal law, and its online reservations program.
Additional facts relating to the Shreveport plant, Elio's activities and website, the online reservations program and Elio's report to the Securities and Exchange Commission are discussed below.
Shreveport Plant
In the initial press release announcing its acquisition of space in the former General Motors manufacturing plant in Shreveport, which GM had closed in 2012, Elio stated the plant would be "the foundation for building the new vehicle " and that the company "has been accepting pre-orders on its website and touring the country to showcase the prototype."[5] (Emphasis added.) Elio initially stated that it would use the existing equipment in the plant but later determined that some of the equipment would not be needed and sold it.
In each of the 13 press releases that followed, the Shreveport plant is mentioned *1140 as Elio's "first manufacturing site." Some press releases referred to the Shreveport plant as Elio's "production facility," while others described it as "a world-class manufacturing facility where General Motors previously built the Hummer H3 and Chevy Colorado." Elio also mentioned the plant on its website and in other public communications about its vehicle, as noted below.
After acquiring space in the Shreveport plant, Elio announced that it would bring 1,500 jobs back to the facility, which had closed recently. Elio's acquisition of space in the plant garnered support from Louisiana's governor, the Louisiana Department of Economic Development, the Caddo Parish Commission, and the Caddo Parish community, according to documents filed in evidence.
At the hearing, Elio's Vice President of Governmental Affairs, Joel Sheltrown, testified that Elio had asked some of its suppliers who normally make their products overseas to make them at the Shreveport plant, where additional space was available for lease, or elsewhere in the United States.
Elio's Activities
Elio has announced that its vehicle will come with air conditioning and heating, power locks and windows, a reinforced roll cage, seatbelts, airbags and antilock brakes and that it will be offered in several colors, with either manual or automatic transmission.
Since the inception of the online reservations program in 2013, Elio has formed engineering and supplier partnerships with more than 20 companies, all of whom were named in press releases, and announced that it had contracted with other companies to build a series of prototype vehicles, as well as a prototype of a unique, highly fuel-efficient internal combustion engine, "specifically for Elio." Elio toured the country with the prototype vehicles and engine to generate interest in the vehicle and to promote its online reservations program. Elio described itself as the first start-up auto company in the United States in 60 years "to build its own internal combustion engine." (Emphasis added.) It appears from the record that the prototype vehicles are driveable.
In 2016, Elio announced that "the Elio Motors team" in Michigan had built the first in a series of test vehicles, known as the E-series, to be used for testing and engineering purposes. This was done under the direction of Gino Raffin, Elio's Vice President of Manufacturing and Product Launch, who was quoted as saying, "We've been receiving assemblies and components from our suppliers since the completion of our engineering phase, and we're excited to see our Elio E-Series vehicles coming together. Our first vehicles will be ready for our suppliers and internal teams to begin testing and calibration in the near future."
In the announcement about the first E-Series test vehicle, Elio described Mr. Raffin as "the guru in process and manufacturing assembly for our Shreveport assembly facility who ... has taken countless vehicle programs through the manufacturing process for other automakers for more than 30 years[.]" (Emphasis added.)
Press releases issued by Elio in 2015 and 2016 described the building of the prototype vehicles, the prototype engine and the E-Series testing vehicles as important steps in its "march toward production ." (Emphasis added.)
In March 2016, Elio announced its plans "to sell 100 pre-production vehicles built at its Shreveport, Louisiana, production facility fourth quarter of 2016 [sic]." The company later changed the target date for assembling these vehicles to 2017. At the hearing in July 2017, Elio's witness, Mr. Sheltrown, testified that Elio had not built *1141 any of the 100 vehicles it had said it would build or produced any other vehicles for sale, primarily due to a lack of funding.
Mr. Sheltrown testified that the prototype vehicles Elio used for promotional purposes were not made by Elio, but by another company, and the final vehicle will not be identical to the prototypes. He acknowledged, however, that the prototypes were built "for Elio, for demonstration purposes."
Elio's Website
Screen shots from Elio's website were introduced in evidence, along with testimony from the Commission's Executive Director, Lessie House, about her visits to the site. This evidence shows that Elio made several present-tense statements about itself and its vehicle online, including the following:
• Elio Motors "is an American vehicle manufacturer committed to revolutionizing how consumers think about transportation" and "is a designer, developer and manufacturer of highly efficient, low cost three wheeled vehicles."
• "The Elio: American Innovation at its finest. U.S. made by American workers at the former GM plant in Shreveport, Louisiana."
• "Introducing the Ultimate Commuter Vehicle. Now you can save time, money and the environment. " (Emphasis added.)
The website includes a picture of the Shreveport plant, with an Elio Motors sign in front of the building, and pictures of prototype vehicles, one of which is shown driving and the other of which appears to be parked at a home. One question in the Frequently Asked Questions section is, "Can I buy one now?" The answer reads: "You can reserve your Elio right now by clicking 'Reserve Your Elio.' " (Emphasis added.)
A person who clicks "Reserve Your Elio Today" can make a refundable or a non-refundable reservation in the amount of $ 100, $ 250, $ 500 or $ 1,000. Elio agreed to add a bonus of 25 percent to the amount of a non-refundable reservation payment, and to apply the combined amount of the payment and the bonus "to the purchase of your Elio ." (Emphasis added.) At one time, the bonus amount was 50 percent. For refundable reservations, the amount to be applied to the purchase is the amount paid for the reservation, with no bonus.
Website visitors can sign up for a newsletter that "will keep you updated on everything between now and the day your Elio arrives ." (Emphasis added.)
Elio's Online Reservations Program
The online reservation program allows members of the public to make a refundable or a non-refundable payment "for your reservation of an Elio vehicle with us, " as stated in the online reservation agreements that accompanied the payments. (Emphasis added.)
Elio began taking online reservations in 2013. By 2014, it had 10,000 reservations. The number increased to 40,000 in 2015, to 60,000 in 2016, and surpassed 65,000 by the time of the hearing in 2017. More than 80 percent of the reservations were non-refundable. Elio has referred to the online payments of both types as a "deposit" or as "customer deposits."
A person who makes a reservation payment must agree to the terms of a reservation agreement that appears on the website. There are separate reservation agreements for refundable and non-refundable reservations.
The Refundable Reservation Agreement states:
*1142 This Reservation Agreement ... is for your reservation of an Elio vehicle with us .
1. Reservation
By entering into this Reservation Agreement, you hereby confirm that you wish to receive an Elio vehicle (prototype can be viewed on our website.)
2. Nature of Agreement; Non-Binding Reservation Payment
The Reservation Payment is REFUNDABLE and provides you with the benefits in Section 4 below depending on the level of your payment. This agreement does not constitute an agreement for the sale of a vehicle and does not lock in pricing, a production slot, or an estimated delivery date. You are under no obligation to purchase a vehicle from us, and we are under no obligation to supply you with a vehicle. If and when we notify you of the availability of the vehicle and you wish to proceed with the purchase, such sale and purchase will be governed by a separate and legally binding Purchase Agreement between you and us or between you and another authorized dealer (Elio). In the event a purchase is made, your Reservation Payment will be credited against the purchase price.
.....
5. Order Process
When the start of production of your reservation nears , we will ask you to confirm your option selections and provide full details regarding the legal purchaser of the vehicle. Elio will create an order for your vehicle containing the information provided by you, and a Purchase Agreement indicating the estimated purchase price of your vehicle, taking into account the base price of the model and any options included or that you select, plus estimates of any applicable taxes, duties, transport and delivery charges, and any other applicable fees. Elio will then submit to you the order and the Purchase Agreement for your review. If you wish to proceed and purchase the vehicle, you must sign and return the Purchase Agreement together with any amounts that are then required to be paid ....
Base vehicle and/or option pricing may not be available at the time of your reservation, and if pricing is available, it is subject to change until agreed upon in an executed Purchase Agreement.
.....
11. Acknowledgments
YOU UNDERSTAND THAT ELIO MOTORS, INC., MAY NOT HAVE COMPLETED THE DEVELOPMENT OF THE VEHICLE OR BEGUN MANUFACTURING THE VEHICLE AT THE TIME OF YOUR RESERVATION. WE WILL HOLD YOUR RESERVATION PAYMENT SEPARATELY IN AN ESCROW OR TRUST FUND BUT WILL NOT PAY ANY INTEREST ON RESERVATION PAYMENTS, EXCEPT TO THE EXTENT REQUIRED BY LAW. (Emphasis added.)
Section 4 of the agreement states that a reservation payment of $ 100 "entitles you to a priority delivery date based upon the date we receive your completed Agreement and payment," and that a payment in a higher amount "entitles you to a priority delivery date ahead of all the participants" who paid a lower amount. (Emphasis added.)
The Non-refundable Reservation Agreement contains the same provisions but identifies the reservation as non-refundable and "All In," and states in Sections 2 and 4 that the reservation payment plus a bonus equal to 25 percent of the payment amount will be credited against the purchase *1143 price in the event a purchase is made. It also states that Elio will not hold the reservation payment separately or in an escrow or trust fund.
In August 2016, Elio instituted a "Limited Time Offer" for non-refundable reservation holders to "lock in" a "vehicle purchase base price" of $ 7,300 until the company reached a total of 65,000 reservations.[6] In a press release announcing this offer, Elio explained that it had applied for an Advanced Technology Vehicles Manufacturing (ATVM) loan from the Department of Energy, and that recent changes to the agency's loan guidelines would require start-up companies "to further demonstrate market acceptance through firm sales commitments ." Paul Elio is quoted in the release as saying, "We have developed more than $ 350 million in pre-production sales with over 56,000 reservations, with the vast majority being non-refundable[.]" (Emphasis added.)
The release further stated that the company
is now seeking the necessary binding purchase commitments to meet the recent change in loan criteria. As an extra incentive for the non-refundable reservation holders, the company will lock in the vehicle price at an even lower $ 7,000* base price for those that make a binding commitment to purchase within the first 65,000 reservations.[7] (Emphasis added.)
About seven months later, in March 2017, Elio mentioned the ATVM loan in its report to the Securities and Exchange Commission and stated that the company "has received 65,255 reservations, of which 36,435 have received the locked in price of $ 7,300 and 21,204 have made a binding purchase commitment and have received the locked price of $ 7,000. " (Emphasis added.) Based on these figures, roughly 88 percent of all reservation holders had secured a locked in price: 56 percent at $ 7,300 and 32 percent at $ 7,000.
Despite these unequivocal statements by Elio, Mr. Sheltrown testified that the base price listed on the website was merely "an estimate ... giving you an idea of what this vehicle may cost when we produce it," and that the price was not locked in, as stated in the Reservation Agreements.
Mr. Sheltrown's business card, which was part of an exhibit introduced in evidence by Elio, lists Elio Motors' toll-free telephone number as 844-BUY-ELIO . (Emphasis added.)
The SEC Report
In a report to the federal Securities and Exchange Commission (SEC) dated March 31, 2017, Elio stated that its online "Customer Reservations" program had generated $ 27.8 million in reservations since 2013, with the reservations averaging $ 545,000 per month over a 51-month period. This included about $ 1.2 million (roughly 4 percent) in refundable "customer deposits" and about $ 26.6 million (roughly 96 percent) in non-refundable "customer deposits."
Elio reported to the SEC that its assets included about $ 2 million as "Restricted cash held for customer deposits," about $ 209,000 in "Restricted cash held in escrow," and about $ 209,000 in unrestricted cash.
*1144 In the SEC report, Elio described the process of designing and launching the production of a vehicle as "highly capital-intensive" and estimated that it would need to raise about $ 376 million in additional capital "to fund production activities." Elio stated that it had not yet generated any revenues and did not anticipate doing so until late in 2018. After reporting that it had experienced "recurring net losses from operations," which caused an accumulated deficit of about $ 146 million and a working capital deficit of about $ 41.5 million, Elio stated:
These factors, among others, raise substantial doubt about our ability to continue as a going concern. If we are unable to continue to obtain financing to meet our working capital requirements, we may have to curtail our business sharply or cease operations altogether.... (Emphasis added.)
The Commission's Investigation
The Commission began investigating Elio's compliance with Louisiana law in 2013, after learning of its online reservations program and acquisition of a manufacturing plant in Shreveport. The Commission's investigators made five trips to the Shreveport plant from January 2013 to July 2017 and prepared a written report of the first four visits. There was no written report of last visit, which occurred on the Friday before the Monday hearing.
On the first four visits, the investigators found only one person at the site: a representative of Elio's lessor and lender in 2013, Elio's site representative and launch manager in 2015, and a security guard in 2016 and May 2017. Each time, the person reported that no vehicles were being produced there. On the later visits, including the last one in July 2017, the investigators found Elio's space in the plant to be empty.[8]
On these visits and in other correspondence with Elio, the Commission advised Elio's representatives of Louisiana's licensing requirements for manufacturers and dealers and of the agency's position that licensing was required prior to taking orders and deposits from potential customers. Elio did not apply for either type of license, taking the position that it was not yet conducting activities for which licensing was required.
Proceedings Below
In November 2016, the Commission filed a formal notice of hearing, alleging that Elio is a motor vehicle manufacturer and dealer, does not have a license in either capacity, and is a manufacturer selling or offering to sell motor vehicles directly to consumers. The hearing notice was later amended to include references to the statutory provisions regulating manufacturers and dealers of recreational products and to allege that Elio "claims to fabricate, manufacture, and/or assemble" recreational products and "would be" a manufacturer (rather than that it "fabricates, manufactures and/or assembles" such products and "is" a manufacturer).
Elio responded to both hearing notices, denying the alleged violations. As of the hearing date, Elio did not have a Louisiana manufacturer's or dealer's license and was still taking online reservations.
Hearing Testimony on Behalf of the Commission
The Commission's Executive Director, Ms. House, has held that position for 25 years and has been with the Commission for 45 years. She testified that the agency is charged with regulating the industry and protecting the consuming public from *1145 fraud, impositions and other abuses, as specifically stated in the legislature's Declaration of Public Policy. See La. R.S. 32:1251, as quoted above.
Ms. House testified that in her experience, manufacturers who have been licensed by the Commission were engaged in a process or progression of activities that included research, development, marketing, and actually manufacturing vehicles, and that such activities constitute manufacturing activity when the process starts, even if manufacturing physically has not yet occurred.
Based on the fact that Elio was collecting money from consumers for its vehicle while holding itself out as a manufacturer and was engaged in research, development and marketing, including the use of prototype vehicles to solicit sales, Ms. House testified that Elio was engaged in activities for which a manufacturer's license was required even if the company was not physically producing vehicles.
Ms. House regarded Elio's online reservation program as the taking of deposits from consumers for the sale of a vehicle, which can only be done by a licensed dealer. She said the fact that Elio had not produced any vehicles despite having solicited and collected more than $ 27 million in reservations over a four-year period caused the Commission to be concerned that Elio could be perpetrating a fraud on consumers in Louisiana and elsewhere.
On cross-examination, Ms. House acknowledged that the statutory definition of a manufacturer does not include one who intends to manufacture. At that point, the Commission's Chairman made comments that Elio now contends were indicative of bias, as discussed in the Due Process Claims section below. Elio did not object to these comments or move to recuse the Chair until the end of the hearing, after both sides had presented their evidence and made their closing arguments. The motion was denied.
Hearing Testimony on Behalf of Elio Motors
Elio's Vice President of Governmental Affairs, Mr. Sheltrown, was a former state representative in Michigan for 16 years and has more than 20 years of experience in dealing with government regulations. He testified that Elio is engaged in the process of developing a vehicle but has not yet manufactured, fabricated, assembled or sold any vehicles.
Mr. Sheltrown stated that the design of the vehicle is not yet finalized and the company is seeking to have federal laws passed to establish safety standards for autocycles, which do not currently exist, so that it can certify that its vehicle meets the highest standards. According to Mr. Sheltrown, Elio cannot obtain a manufacturer's certificate of origin or a federal vehicle identification number (VIN) for its vehicle until those things occur, and a certificate of origin and VIN must be submitted with an application for a manufacturer's license.[9] The Commission counters that it will accept an exemplar of the certificate form with an application. The fee for filing an application is $ 1,000.
Mr. Sheltrown testified that Elio did not apply for a dealer's license because dealers are required to have a franchise agreement with a manufacturer, and Elio does not have a manufacturer's license. Additionally, Elio maintained that it was not required to be licensed as a dealer because it was not selling or offering to sell vehicles.
In support of this position, Mr. Sheltrown pointed to a number of the provisions in the Reservation Agreements, including those that state the reservation agreement *1146 does not create an obligation to buy or sell a vehicle and does not lock in pricing, a production slot or an estimated delivery date. Based on that language and the fact that the vehicle's design had not been finalized, Mr. Sheltrown said Elio did not consider the reservation payments to be deposits or orders for the sale of a vehicle, but merely payments to reserve a "spot in line" for a possible, but not guaranteed, sale in the future. He said the people who "have placed funds down on a spot in line agreement ... all understand that they are putting their money at risk."
Mr. Sheltrown was aware of only one customer complaint against Elio relating to the online reservation program, which was resolved in Elio's favor after being litigated in Texas. He acknowledged that other people in the company would know more about customer complaints than he would.
Mr. Sheltrown testified that other states have licensing requirements similar to Louisiana's requirements and that Elio had not been charged with violations in any other state. He stated that Elio will seek the appropriate Louisiana licenses in the future, but it has not yet engaged in activities for which licensing is required.
Decisions Below
At the conclusion of the hearing, the Commission's prosecuting attorney submitted proposed findings of fact and conclusions of law for the agency's consideration, as permitted by La. R.S. 49:958.[10] Elio did not submit any proposed factual findings or legal conclusions. The Commission voted to adopt each of the prosecutor's proposed findings and conclusions, on the record, with no discussion. Elio contends this amounted to an improper commingling of the agency's prosecutorial and adjudicative roles, depriving Elio of due process.
The Commission found Elio to be in violation of the licensing requirements for recreational product manufacturers and dealers, as well as the prohibition on a manufacturer's offering to sell recreational products directly to consumers, for more than 1,530 days (51 months as of March 2017), or a little over four years. La. R.S. 32:1254(A)(1), 1254(A)(18), 1270.11(1)(h)(i).
The Commission is authorized to impose penalties not exceeding $ 5,000 per day for each day a violation continues and may cast any party with costs, including the Commission's attorney fees. La. R.S. 32:1260(A)(1), (C). In this case, the agency imposed fines totaling $ 545,000, with half of this amount ($ 272,500) being for the two manufacturer violations and the other half for the dealer violation. This amounts to about $ 178 per day for the manufacturer violations and the same amount for the dealer violations, for a total of $ 356 per day.
The Commission ordered Elio to provide proof within 60 days that the refundable reservation payments it had collected were in a trust account, in default of which Elio would be required to pay an additional $ 5,000 per day from the date of the Commission's judgment until such proof was presented. Elio was cast with all costs of the proceeding, including the Commission's attorney fees.
Elio petitioned the district court for judicial review of the Commission's judgment and obtained an order staying enforcement *1147 of the judgment pending judicial review. The district court affirmed the findings of violations and reduced the fines to $ 76,500 ($ 38,250 for the manufacturer violations and the same amount for the dealer violation), plus $ 1,000 per day if Elio did not show that the refundable reservation payments were held in a trust account. The court upheld the agency's decision to cast Elio with costs and attorney fees.
Both parties have appealed the district court judgment. Elio seeks to have the findings of violations overturned on several grounds, including a claim that it was denied due process at the hearing. Elio also contends there is no legal authority for requiring proof that any funds it collected were escrowed and assessing an additional daily penalty if such proof is not provided.
The Commission seeks to have the fines it imposed reinstated.
COMMISSION'S FINDINGS OF FACT AND CONCLUSIONS OF LAW
The Commission made the following findings of fact and conclusions of law, which the district court found to be supported by the law and the evidence:
Findings of Fact
1. Elio Motors, Inc. does not possess a Louisiana Motor Vehicle Commission license to conduct business as a Recreational Products Manufacturer.
2. Elio Motors, Inc. does not possess a Louisiana Motor Vehicle Commission license to conduct business as a Recreational Products Dealer.
3. Elio Motors, Inc. is engaged in the business of designing, developing and manufacturing three-wheel vehicles that fit the definition of a motorcycle under Louisiana Revised Statute 32:1252(30), and such vehicles are considered Recreational Products under [R.S.] 32:1252(45).
4. While holding itself out as a Manufacturer of vehicles that are defined as Recreational Products, Elio Motors, Inc. has solicited and taken sales reservations from the public for such vehicles totaling over $ 27.8 million, over a period of at least 51 months.
5. By soliciting and collecting over $ 27.8 million in sales reservations for its vehicles, Elio Motors, Inc. engaged in offering to sell Recreational Products as defined in [R.S.] 32:1252(45) without first obtaining a Louisiana Motor Vehicle Commission license as a Recreational Products Dealer, over a period of at least 51 months.
Conclusions of Law
1. By operating as a Manufacturer of Recreational Products without possessing a license from the Louisiana Motor Vehicle Commission, Elio Motors, Inc. violated Louisiana Revised Statute 32:1254(A)(1) ; and
2. By acting as a Manufacturer of Recreational Products and then offering to sell Recreational Products directly to consumers, Elio Motors, Inc. violated Louisiana Revised Statute 32:1270.11(1)(h)(i) ; and
3. By acting as a Recreational Products Dealer and offering to sell Recreational Products directly to consumers, Elio Motors, Inc. violated Louisiana Revised Statute 32:1254(A)(18).
ASSIGNMENTS OF ERROR
Elio contends the district court erred in affirming the Commission's findings of violations because the agency exceeded its authority and erred as a matter of law in several respects:
*1148 (a) By expanding the statutory definition of the term "manufacturer" to include pre-production activities;
(b) By ruling that Elio offered to sell recreational products despite the express terms of Elio's online Reservation Agreements, which do not meet the requirements for a sale or an offer of sale under Louisiana law; and
(c) By penalizing Elio without any evidence that its conduct occurred in or has any connection to Louisiana.
Elio also contends the district court erred in failing to consider its denial of due process claims, which rest primarily on the Chairman's comments and the Commission's adoption of the prosecuting attorney's proposed findings of fact and conclusions of law. These claims are discussed more fully below.
The Commission assigns as error the district court's reduction of the two fines and the daily penalty assessed against Elio, claiming the agency had a rational basis for its assessments and the amounts it assessed were within its statutory discretion. Elio contends the fines imposed by the Commission were clearly excessive and without a rational basis. Elio also claims there is no legal authority for requiring it to prove that any funds it collected were escrowed and assessing a prospective penalty if such proof is not provided.
STANDARD OF REVIEW
In a proceeding governed by the Administrative Procedure Act, an appellate court reviews the trial court's judgment de novo and conducts an independent review of the relevant facts and law. Marler Ford Co., Inc. v. Ford Motor Co. , 04-342 (La. App. 5 Cir. 10/12/04), 885 So.2d 654, 658, writ denied , 04-3171 (La. 2/25/05), 894 So.2d 1154.
The scope of judicial review of an administrative agency's decision is set forth in La. R.S. 49:964(G), which states:
G. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of the evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
Subsection 964(G)(5) is used in reviewing an agency's exercise of discretion, its conclusions of law, and mixed questions of fact and law. Subsection 964(G)(6) is used in reviewing questions of fact and requires that due regard be given to credibility determinations based on an agency's or a tribunal's firsthand observations of witnesses. Carpenter v. State, Dept. of Health and Hospitals , 05-1904 (La. App. 1 Cir. 9/20/06), 944 So.2d 604, 608-610, writ denied , 06-2804 (La. 1/26/07), 948 So.2d 174.
*1149 When the issue on judicial review involves the agency's evaluation of the evidence and application of law to facts, the court's review becomes somewhat intertwined. Credibility determinations of evidence are considered as factual questions under Subsection 964(G)(6), but the application of the law to the facts is a legal conclusion subject to analysis under Subsection 964(G)(5). Carpenter, 944 So.2d at 609 ; Wild v. State, Dept. of Health and Hospitals , 08-1056 (La. App. 1 Cir. 12/23/08), 7 So.3d 1, 6-7.
Here, there is no dispute as to most of the underlying facts concerning the nature and extent of Elio's activities, although it is clear from the record that the Commission did not believe some of the reasons given by Elio for not seeking a Louisiana license. In our independent review of the facts, we give due regard to the agency's credibility determinations, as directed by Subsection 964(G)(6).[11]
The crux of the dispute here centers on the application of the law to the facts with respect to the findings of statutory violations and on the exercise of discretion with respect to the assessment of penalties. We review these matters under Subsection 964(G)(5) for arbitrariness, capriciousness or an abuse or unwarranted exercise of discretion.
An arbitrary decision shows disregard of evidence or of the proper weight thereof, while a capricious decision has no substantial evidence to support it or the conclusion is contrary to substantiated competent evidence. Carpenter , 944 So.2d at 612. As stated in Subsection 964(G)(5), the exercise of discretion by an agency or a tribunal must be neither abusive nor clearly unwarranted. Id.
STATUTORY PROVISIONS
The Commission and the district court concluded that Elio fit within the statutory definitions of a recreational products manufacturer and dealer. Based on our independent review of the facts and the law, we agree.
The term manufacturer is defined as "any person, resident or nonresident, who fabricates, manufactures, or assembles motor vehicles, recreational products, or new, remanufactured, reconditioned, or rebuilt motor vehicle or marine motors." La. R.S. 32:1252(24).[12]
A recreational products dealer is defined as
any person who, for a commission or with intent to make a profit or gain of money or other thing of value, buys, sells , brokers, exchanges, auctions, offers, or attempts to negotiate a sale or exchange of an interest in recreational products and who is engaged wholly or in part in the business of buying and selling recreational products in the state of Louisiana. Duly franchised and licensed recreational products dealers shall be the only persons entitled to sell, publicly solicit, and advertise the sale of new recreational products.
§ 1252(46)(a). (Emphasis added.)
The licensing requirements appear in La. R.S. 32:1254(A), which states:
*1150 The following persons shall be licensed by the commission in order to engage in business in the state of Louisiana, regardless of whether or not said person maintains or has a place or places of business in this state, and it is a violation of this Chapter to operate without first obtaining a license:
(1) Manufacturers.
.....
(18) Recreational products dealers.
.....
The prohibition on a manufacturer offering to sell recreational products directly to a consumer appears in La. R.S. 32:1270.11 :
It shall be a violation of this Part:
(1) For a manufacturer, ... or officer, agent, or other representative thereof:
.....
(h)(i) To sell or offer to sell a new or unused motorcycle or all-terrain vehicle directly to a consumer except as provided in this Chapter[.]
...[13]
ANALYSIS
The starting point for interpreting a statute is the language of the statute itself. Clark v. Wal-Mart Stores, Inc. , 18-52 (La. App. 5 Cir. 10/31/18), 259 So.3d 516, 521 ; Turner v. East Baton Rouge Parish School Board , 17-1769 (La. App. 1 Cir. 6/4/18), 252 So.3d 990, 993, writ denied , 18-1127 (La. 10/15/18), 253 So.3d 1299. La. R.S. 1:3 directs that words and phrases in a statute "shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." When the wording of a statute is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. La. R.S. 1:4.
Statutes which authorize the imposition of a penalty must be strictly construed. Gibbs Const. Co., Inc. v. State, Dept. of Labor , 540 So.2d 268, 269 (La. 1989). An administrative agency must act in conformity with its statutory authority, which it cannot exceed, and cannot go too far afield from the letter of the law even if it perceives that it is furthering the law's spirit. Benson & Gold Chevrolet, 403 So.2d at 20.
Elio Is a Manufacturer
The legislature has defined the term "manufacturer" as one who "fabricates, manufactures, or assembles" recreational products. This definition is very broad and general. It connotes that the activities must occur in the present tense, but it does not specify what types of activities are either included in or excluded from the definition, apart from the three verbs listed. Under these circumstances, the words used in the statute must be given their generally prevailing meaning based on context and common usage. La. R.S. 1:3 ; Turner, 252 So.3d at 994.
Dictionaries are a valuable source for determining the common and approved usage of undefined words in a statute. Id. , citing Gregor v. Argenot Great Cent. Ins. Co. , 02-1138 (La. 5/20/03), 851 So.2d 959, 964. See also Clark, 259 So.3d at 522 and Hopkins v. Howard , 05-0732 (La. App. 4 Cir. 4/5/06), 930 So.2d 999, 1005, writ denied , 06-1047 (La. 6/23/06), 930 So.2d 984.
Common sense is also a permissible consideration in statutory interpretation, *1151 even when the statute is penal in nature or requires a strict construction for other reasons. See and compare U.S. v. Picquet , 963 F.2d 54, 56 (5th Cir. 1992), cert. denied , 506 U.S. 902, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992) (criminal statute) and Haynes v. Mangham , 375 So.2d 103, 105 (La. 1979) (adoption statute). When interpreting a law that must be strictly construed, courts should not interpret it in a way that makes it meaningless and ineffective. Haynes , 375 So.2d at 106, citing In re Ackenhausen , 244 La. 730, 154 So.2d 380 (1963).
In affirming the Commission's conclusion that Elio was a manufacturer, the district court considered the definition of "manufacture" in Black's Law Dictionary (4th ed. rev. 1968):
MANUFACTURE, v. From Latin words manus and factura, literally, put together by hand. Now it means the process of making products by hand or machinery. (Emphasis added.)
The district court also considered that the Commission, which is charged with administering the regulatory scheme, construed the term to mean a process culminating in, but not limited to, the physical production of a finished product, as evidenced by Ms. House's testimony about the activities other manufacturers were engaged in when they were licensed by the Commission. In support of this, the court cited case law concerning the persuasive value of an agency's interpretation of its own rules and regulations.[14] We do not find that law to be applicable here, as we are not interpreting any of the Commission's own rules or regulations.
Moreover, there was no evidence that the agency adopted its interpretation of the statute soon after the statute was enacted and adhered to it over a long period of time, as was the case in Traigle v. PPG Industries, Inc. , 332 So.2d 777, 782 (La. 1976) and Southern Message Service, Inc. v. Louisiana Public Service Com'n , 554 So.2d 47, 54 (La. 1989). Although the Commission's interpretation does not carry as much weight as it would under those circumstances, it may still be considered, along with all of the other evidence in the case.
Notably, throughout the years in question, Elio described itself as a manufacturer-in the present tense-in a variety of contexts and described its design, research and development, marketing and fundraising activities as part of a process leading to the mass production of its vehicle in many public communications, despite some statements to the contrary in the Reservation Agreements and elsewhere. Elio continued to do this even after being notified of the Commission's position that it was engaged in activities for which licensing was required.
Elio partnered with a number of suppliers of parts and technology to be incorporated into its vehicles and asked some of them to make their products in the United States rather than overseas, in furtherance of Elio's commitment that its vehicle would be made in America.
Additionally, Elio employed a Vice President of Manufacturing and Product Launch to coordinate the building of the E-Series test vehicles by "the Elio Motors team" and touted Mr. Raffin's experience in "taking countless vehicle programs through the manufacturing process for other automakers." This statement, which accompanied Mr. Raffin's references to the vehicle's engineering and testing phases, *1152 indicates that Elio considered those phases to be part of the manufacturing process.
Elio also took credit for building the prototype vehicles and the customized prototype engine it used to promote its reservation program and other fundraising efforts, but now seeks to avoid classification as a manufacturer because the prototype vehicles and engine were actually built by other companies, though admittedly for Elio and at Elio's direction.
Elio's own conduct, including the manner in which it described itself to gain public confidence, supports the conclusion that Elio is a manufacturer. Elio cannot claim to be a manufacturer when such claims work to its benefit and then disclaim its status as a manufacturer for purposes of the licensing requirements and the prohibition on a manufacturer's offering to sell directly to consumers.
Elio Offered to Sell Recreational Products
Similarly, the manner in which Elio communicated with the public about its vehicle, the online reservations program and the reservation payments is not consistent with Elio's claim that it was not selling or offering to sell vehicles, despite some language in the Reservation Agreements that supports Elio's position.
Elio contends it did not sell or offer to sell recreational products because the Motor Vehicle Commission Law does not define the terms "sell" and "offer to sell," and under general contract law, the parties to a sale or an offer to sell must consent to the thing and a fixed or determinable price, as set forth in Louisiana Civil Code articles 2439, 2464, 2623 and 2624. Elio contends the online reservations do not satisfy those requirements because the Reservation Agreements made it clear that reservations were for a spot in line rather than for a vehicle, that the price of the vehicle had not been fixed, and that the reservation payment would be credited toward a possible, but not a guaranteed, future sale if the parties agreed to one at a later date, negating its classification as a deposit.
As noted above, other language in the Reservation Agreements conveys a different message. The agreement states that it "is for your reservation of an Elio vehicle with us." It does not say it is for your reservation of a "spot in line to buy an Elio vehicle," or a "place in line to purchase an Elio later, if they go to production." The agreement refers the reader to Elio's website to view a prototype of the vehicle and states that the reservation payment (and a bonus, if the reservation is non-refundable) "entitles you to a priority delivery date," depending on the type and amount of the reservation payment. Section 5 of the agreement begins with the statement, "When the start of production of your reservation nears." It does not say "if" the start of production of your reservation nears.
Elio's website depicts prototype vehicles, lists a specific targeted base price for the vehicle, and offers or has offered a lower "locked in price" to certain non-refundable reservation holders and an even lower "locked in price" to those who make a "binding purchase commitment." It urges visitors to "reserve your Elio today" and to subscribe to a newsletter for updates on company news "between now and the day your Elio arrives." Elio referred to the online reservation payments as "customer deposits" to be applied "to the purchase of your Elio."
Elio's communications with the public, when taken as a whole, clearly indicate that a visitor to the site can purchase an Elio vehicle for their own personal use by making a deposit to be credited toward the purchase price. They do not clearly indicate that a reservation payment is merely an investment in the company by someone *1153 who is knowingly undertaking the risk that the company may never produce any vehicles.
The Commission and the district court properly considered the totality of Elio's communications about the online reservation program, and not just certain portions of the online Reservation Agreements that characterize it more restrictively, in concluding that Elio offered to sell recreational products. Based on our independent review of the evidence, we agree with their conclusions.
We recognize that Elio can point to some things it said and did that would support its assertions that it does not fit within any of the statutory definitions upon which the findings of violations were based. However, those actions must be viewed in conjunction with all of the other evidence, rather than in isolation. The fact that some of Elio's actions may not fit the definitions does not preclude consideration of other evidence to the contrary. Elio's own actions, as well as the plain meaning and a common-sense interpretation of the statutory terms, make it clear that Elio falls within the scope of the definitions upon which the findings of violations were based.
The Commission's factual findings relating to Elio's status as a recreational products manufacturer and dealer, which were affirmed by the district court, are supported by a preponderance of the evidence. The Commission's and the district court's legal conclusions that Elio violated the licensing requirements for recreational products manufactures and dealers, and the prohibition on a manufacturer's offering to sell recreational products directly to a consumer, are not arbitrary, capricious or indicative of an abuse of discretion. We find no basis for overturning the findings of violations under La. R.S. 49:964(G)(5) and (G)(6).
Elio's Connection to Louisiana
Elio contends the Commission exceeded its authority by penalizing Elio without any evidence that its conduct occurred in Louisiana or has any connection to Louisiana. Elio claims there is no evidence that it accepted reservations from Louisiana consumers or engaged in any activity in Louisiana other than leasing space in the former GM plant in Shreveport.
Elio launched its online reservations program at around the same time that it leased space in the former GM plant in Shreveport and identified the Shreveport plant as its principal place of business in Louisiana in its filing with the Louisiana Secretary of State. Elio repeatedly identified the Shreveport plant as the place where its vehicle would be made, both online and in other public statements. Elio committed to building its vehicle in America and did not have a plant anywhere else. Elio described the Shreveport plant as a "world-class manufacturing facility where General Motors previously built the Hummer H3 and Chevy Colorado," and announced that it would bring 1,500 jobs back to the facility, garnering support from state and local public officials and agencies, as well as the Caddo Parish community. Elio's association with a well-established manufacturing facility in Louisiana lent credence to its marketing and fundraising efforts, including the online reservations program, the nationwide tours, the loans it obtained, the equity crowdfunding investment campaign, and the public sale of its stock.
Under these circumstances, we conclude that Elio's conduct had a sufficient connection to Louisiana to subject it to penalties for failing to comply with Louisiana law. The Commission did not exceed its authority by imposing penalties. La. R.S. 49:964(G)(2).
*1154 Elio's Conduct in the Context of the Regulatory Scheme
Although Elio was not charged with engaging in fraud or false advertising, the purpose of the licensing law is to protect the public from physical and financial harm, including frauds, impositions, and other abuses, by providing administrative oversight of those who engage in activities covered by the law. This oversight includes evaluating the financial standing and business integrity of all license applicants and holders, among other things, and provides the public with a measure of accountability by those who are subject to the licensing requirements. See La. R.S. 32:1251 and other authorities cited above in the section entitled Regulatory Scheme. Elio seeks to engage in such activities without being held accountable to the public, despite having told the SEC that there is "substantial doubt" about its ability "to continue as a going concern."
Elio has solicited and collected almost $ 28 million from consumers who wish to reserve "an Elio vehicle." Elio contends it is not required to seek a manufacturer's license until it actually produces a finished product for sale and obtains a vehicle identification number to submit with the licensing application. Elio further claims it is not required to seek a dealer's license because dealers must have a franchise agreement with a manufacturer, and Elio does not have a manufacturer's license. This type of circular reasoning renders the regulatory scheme ineffective and meaningless.
Louisiana law requires recreational products manufacturers and dealers to be licensed before they engage in business here, prohibits manufacturers from selling or offering to sell directly to a consumer, and states that duly franchised and licensed recreational products dealers are the only persons entitled to sell, publicly solicit, and advertise the sale of new recreational products. La. R.S. 32:1254(A)(1), 1254(A)(18), 1270.11(1)(h)(i), 1252(46)(a). Once Elio began soliciting money from the public to reserve a vehicle and identified the Shreveport plant as the place where Elio would make the vehicle, its conduct became a legitimate concern for the Louisiana licensing authority. The fact that Elio's manufacturing facility remained idle for four years while it continued to accept online reservations for vehicles, as well as Elio's description of its precarious financial condition in the SEC report, reinforce the need for the type of oversight and accountability the licensing law requires for the public's protection.
In this case, the Commission acted in conformity with its statutory authority. This case is distinguishable from Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission , supra . There, the Commission's denial of a licensed dealer's application to relocate to a neighboring parish was reversed because it was based on the agency's erroneous construction of the law and on its conclusion that having two dealerships in close proximity could be financially harmful to both dealerships-a factor that was not among those the agency was legislatively authorized to consider. 403 So.2d at 18-22.
Denial of Due Process Claims
Elio contends it was deprived of due process in the proceedings before the Commission and seeks to have the judgments below overturned on that basis, pursuant to La. R.S. 49:964(G)(1) and (G)(3) (violation of constitutional rights and use of unlawful procedure).[15]
*1155 The primary basis for this claim is Elio's contention that it was deprived of a fair and impartial adjudication before a neutral decision-maker because the Commission's Chairman made inflammatory comments indicative of bias at the hearing, and because the Commission impermissibly commingled its prosecutorial and adjudicative roles by adopting the findings of fact and conclusions of law exactly as they were drafted by the prosecuting attorney, with no discussion or deliberation. Elio also claims it was denied due process because the Commission refused to respond to Elio's discovery requests, omitted responsive documents from its responses to Elio's public records requests, and knowingly prosecuted Elio under statutes the Commission knew to be inapplicable, and because the Chairman overruled certain evidentiary objections Elio made at the hearing.
Elio asserted all of these claims in the district court, but the court did not mention them in its ruling. Because the court affirmed the findings of violations and the imposition of penalties, its silence on the denial of due process claims is considered an implicit rejection of them. Joseph v. Houston , 04-350 (La. App. 5 Cir. 10/12/04), 886 So.2d 1133, 1136-1137.
Chairman's Comments
After the Commission introduced evidence that strongly supported the charges, the bulk of which was authored by Elio, Elio's counsel began questioning Ms. House about whether certain things were included in the statutory definitions. During this line of questioning, the Commission's Chairman expressed his "opinion" that Elio's defense of the charges against it was "disgraceful," and his belief that Elio has "duped people" through its online reservations program and "should be turned over to the Attorney General." Elio's counsel thanked the Chairman for his opinion, but did not object to his comments or move to recuse him at that time.
Later in the hearing, during the questioning of Elio's witness, Mr. Sheltrown, the Chairman asked the witness some questions to clarify his testimony and stated that the Commission's ultimate responsibility, which it does not take lightly, is to protect the consumer. After both sides made closing arguments, the Chairman stated, "I thank both Counsels for their very well done presentation today," and confirmed that all exhibits offered by both parties were admitted into evidence. The case was essentially submitted for a decision at that point.
Elio's counsel then made an oral motion to recuse the Chairman "for the statements he made, which I believe show a bias and an animosity toward Elio." The prosecuting attorney, Mr. Reggie, argued that the motion should be denied on several grounds, including the fact that Elio had not complied with the procedural requirements for a recusal motion.[16]
Although no formal ruling was made on the motion, it is clear from the record that the motion was denied. The Chairman did not vote on any of the issues relating to violations or penalties because the Chair votes only in case of a tie and there were no tie votes in this case. Elio did not seek to recuse anyone other than the Chairman.
*1156 For several reasons, we find no merit to Elio's claim that the Chair's comments resulted in a denial of due process. First, Elio did not promptly file an affidavit asserting the grounds for requesting the Chairman's disqualification, as required by La. R.S. 49:960(B), and did not object to the Chairman's comments or seek his disqualification until the end of the hearing, after the case was submitted. Consequently, Elio is deemed to have waived its objection to having the Chairman continue to preside at the hearing. See and compare Kelley Blue Book Co., Inc. v. Louisiana Motor Vehicle Commission , 16-281 (La. App. 5 Cir. 12/7/16), 204 So.3d 1139, 1151, writ denied , 17-0032 (La. 2/10/17), 216 So.3d 49 and Fleming v. Louisiana Dept. of Ed. , 293 So.2d 658, 661 (La. App. 1 Cir. 1974), writ denied , 299 So.2d 358 (La. 1974). See also K.P.W. v. M.P. , 07-904 (La. App. 3 Cir. 12/5/07), 2007 WL 4248592, p. 3, writ denied , 08-0122 (La. 2/1/08), 976 So.2d 726, writ not considered , 08-122 (La. 3/24/08), 977 So.2d 944.
Additionally, the Chairman did not vote on any of the substantive issues, and we do not find his comments, when viewed in light of the record as a whole, to rise to the level of a due process violation. Moreover, Elio has received a de novo review of the evidence by two courts. Under these circumstances, we conclude that the Chairman's comments did not violate Elio's constitutional right to a fair and impartial adjudication before a neutral decision-maker.
Findings of Fact and Conclusions of Law
Elio contends the Commission impermissibly commingled its prosecutorial and adjudicative roles by adopting the findings of fact and conclusions of law drafted by the prosecuting attorney in their entirety, with no discussion or deliberation, and that this amounts to a denial of due process under Allen v. Louisiana State Bd. of Dentistry , 543 So.2d 908 (La. 1989) and Georgia Gulf Corp. v. Board of Ethics for Public Employees , 96-1907 (La. 5/9/97), 694 So.2d 173. Based on the facts of this case, we disagree.
A strong presumption of honesty and integrity exists in those serving as adjudicators. To overcome this presumption, a party must present convincing evidence that the combination of functions in the same individual poses such a risk of actual and substantial bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be preserved. Kelley Blue Book , 204 So.3d at 1151-1152.
As noted above, La. R.S. 49:958 requires an administrative agency to make written findings of fact and conclusions of law and to rule on each proposed finding submitted by a party in accordance with agency rules. Neither party has cited any agency rules on the subject.
After the parties completed their closing arguments to the Commission summarizing their views of the law and the evidence, the Commission's prosecuting attorney submitted proposed findings of fact and conclusions of law to the Commission members for their consideration, on the record, in the presence of Elio's counsel and the Commission's neutral legal advisor, Mr. LaPeyronnie.[17] Elio did not submit any proposed factual findings or legal conclusions and did not object to any of the prosecutor's proposed findings and conclusions.
The prosecuting attorney read his proposed findings and conclusions one at a *1157 time. As he finished reading each one, a Commission member moved to approve it, and the motion was seconded and voted on. Some motions were approved unanimously; some were not. All of this took place on the record. Elio does not assert, and the record does not suggest, that the prosecuting attorney had any impermissible ex parte communications with any Commission member.
In the Allen and Georgia Gulf cases, the administrative agency had only one attorney who acted in dual capacities, as the agency's prosecutor and as its general counsel. In both cases, that attorney had communicated with agency members about the agency's decision outside the presence of the other side. In Georgia Gulf , some of the parties charged with violations had raised an objection to or suggested changes to the opinion proposed by the agency's attorney, and the agency did not rule on any of them, contrary to La. R.S. 49:958.
In this case, the Commission had a neutral legal advisor other than Mr. Reggie who was present at the hearing, and there is no evidence of any ex parte communications between Commissioners and Mr. Reggie. Elio's counsel was present when Mr. Reggie submitted his proposed findings and conclusions to the Commission. Elio did not object to any of Mr. Reggie's proposed findings and conclusions or submit any of its own. The Commission's approval of each of the proposed findings and conclusions took place on the record. Both sides had asserted their respective interpretations of the evidence and the statutes in question throughout the proceedings, in their opening statements, during the presentation of evidence, and in closing arguments. The prosecutor's proposed findings and conclusions were consistent with other statements he made about the case during the proceeding and the allegations in the amended notice of hearing.
Under these facts, we find no improper commingling of agency functions. Even if we were to find any impropriety in that regard, Elio has not presented convincing evidence that it posed such a risk of actual and substantial bias or prejudgment that Elio's constitutional right to a fair and neutral adjudication was violated. Kelley Blue Book , 204 So.3d at 1152.
Other Due Process Arguments
We find Elio's remaining arguments in support of its claim that it was deprived of due process to be without merit. Elio did not file a motion to compel the Commission to respond to its discovery requests and did not preserve an objection to the manner in which the Commission responded to its public records requests. Elio did not object to the admissibility of the May 4, 2017 investigative report, which is the only document Elio contends the Commission never produced.
With respect to the Chairman's overruling of Elio's objections to certain questions asked of Ms. House, which Elio claimed called for a legal conclusion, Elio either did not object at all or objected only after the witness had answered the question. The SEC report with information about Elio's financial condition was clearly relevant.
As to Elio's claim that the Commission prosecuted Elio under statutes it knew to be inapplicable-those dealing with motor vehicles rather than motorcycles-Elio did not dispute the applicability of the term "motor vehicle" in its responses to the original and amended hearing notices, and Elio has referred to its vehicle as a motor vehicle at times. In a press release, Elio acknowledged that there is some confusion in terminology with respect to its vehicle because it has many of the same attributes of a passenger car but only three wheels; Elio stated that the vehicle "is unlike anything on the market today."
*1158 Once again, Elio's own conduct refutes its argument.
With respect to each of Elio's denial of due process claims, Elio has either waived its objection or has not shown that the Commission's actions prejudiced its substantial rights, a prerequisite to modification or reversal of the agency's decision under La. R.S. 49:964(G)(1) and (G)(3).
PENALTIES
The Commission appealed the district court's reduction of the fines imposed by the agency and seeks to have the fines it initially imposed reinstated. Elio contends the fines imposed by the Commission were clearly excessive and without a rational basis. Elio also claims there is no legal authority for requiring it to prove that any funds collected pursuant to the Refundable Reservation Agreements were escrowed and assessing an additional daily penalty if such proof is not provided.
We review the sanctions imposed by the Commission to determine if they were arbitrary, capricious, or outside the bounds of the agency's statutory authority and discretion. La. R.S. 49:964(G)(2), (G)(5).
A sanction is arbitrary if it is without a rational basis. Mayeaux's Food and Sporting Goods, Inc. v. State, Dept. of Health and Human Resources , 470 So.2d 469, 473 (La. App. 1 Cir. 1985). The court in Mayeaux adopted these statements by the administrative law judge:
The imposition of an administrative sanction ... is in the nature of a disciplinary measure. In deciding what, if any, discipline to impose, an administrator, or administration, may, within the range of permissable (sic) discretionary limits, be strict, moderate or lenient; and in the exercise of that discretion, the choice of the administration, or of an administrative official carrying out administrative policy, defines that administration's political philosophy, its priorities and emphasis. Such decisions distinguish one administration from another, and in part, determines [sic] its unique character and reputation. Unless arbitrary, such discretionary decisions must be upheld.
470 So.2d at 472-473. Bracketed notation added.
It is clear from the Commission's deliberations regarding penalties that its paramount consideration was the protection of consumers. This is consistent with the Commission's role and the legislature's statement of purpose in enacting the licensing law, as noted above.
Fines
La. R.S. 32:1260 (A)(1) states: "No civil penalty imposed for the violation of the provisions of this Chapter or the rules and regulations of the commission shall exceed five thousand dollars for each day such violation continues."
Mr. Reggie urged the Commission to impose a fine of $ 7.5 million for the three violations combined. This is close to the statutory maximum of $ 5,000 per day for a single violation for 1,530 days, or $ 7.65 million.[18] The fines imposed by the Commission were considerably less than this: $ 272,500 for the two manufacturer violations (operating without a license and offering to sell directly to consumers) and $ 272,500 for operating without a dealer's license. This equals about $ 178 per day for each of the two violation categories, or $ 356 per day, an amount that is well within the Commission's statutory discretion. The fine imposed is about seven percent of the $ 5,000-per-day maximum for one violation, and less than four percent of the $ 10,000-per-day maximum for two violations.
*1159 The Commission considered Elio's statements in the SEC report that it had collected $ 27.8 million in online reservation payments through March 2017, with the payments averaging $ 545,000 per month. This indicates that Elio began soliciting and collecting payments in January 2013 and did so continuously for a period of 51 months, or about 1,530 days. Throughout that time, Elio was engaged in activities for which licensing was required, and the Commission repeatedly tried to work with Elio toward compliance, to no avail. The fines imposed by the Commission for Elio's ongoing statutory violations total $ 545,000 and represent the equivalent of one month of online payments, or about two percent of Elio's total collections from the online reservations program through March 31, 2017.
The district court agreed that fines should be assessed for a period of 1,530 days but reduced the amount to $ 25 per day, for a total of $ 76,500 ($ 38,250 for the manufacturer violations and the same amount for the dealer violations). The court did not state its reasons for the reduction.
Considering the duration of Elio's statutory violations and the other evidence bearing on the penalty issue, we do not find the fines imposed by the Commission to be arbitrary, capricious, or an abuse of the agency's discretion.
Trust Account Requirement
The Commission and the district court ordered Elio to provide proof to the Commission within 60 days of the signing of their respective judgments of its establishment of a trust account into which all amounts collected for refundable reservation payments are to be deposited and proof of the deposits into such accounts, and assessed an additional per-day fine from the signing of the judgment until Elio presents proof of the establishment of such trust account and the deposits into such trust account. The Commission fixed the per-day amount at $ 5,000. The district court reduced it to $ 1,000, but did not state its reasons for doing so.
We conclude that the Commission did not exceed its authority in imposing these conditions and an additional $ 5,000 per day fine if the conditions are not met. The Refundable Reservation Agreement states that Elio "will hold your reservation payment separately in an escrow or trust fund." In March 2017, Elio reported to the SEC that that had collected about $ 1.2 million in refundable reservation payments. Elio stated that its assets included about $ 2 million as "Restricted cash held for customer deposits," about $ 209,000 in "Restricted cash held in escrow," and about $ 209,000 in unrestricted cash. This suggests that the amount of restricted cash held for customer deposits is not being held in escrow, contrary to Elio's assertions in the Refundable Reservation Agreement. We find the conditions imposed by the Commission to be within the scope of its authority to protect the consumers to whom Elio made such representations in the event that Elio is not already holding the refundable reservation payments in escrow.
Based on the evidence presented at the hearing, we cannot say that the Commission exceeded its authority or acted without a rational basis with respect to any of the fines it imposed. We reverse the district court's judgment insofar as it reduced the fines imposed by the Commission and reinstate all of the fines imposed by the Commission, as set forth below.
CONCLUSION
Based on our independent review of the record, we conclude that Elio Motors violated the laws in question, its due process rights were not violated, and the Commission had a rational basis for the penalties it imposed. Accordingly, we affirm the findings *1160 of violations, reverse the district court's assessment of penalties and reinstate the penalties imposed by the Commission: $ 272,500 for the manufacturer violations, $ 272,500 for the dealer violation and $ 5,000 per day if the conditions relating to the refundable reservation payments, as set forth in the district court's judgment, are not met. The 60-day period for Elio to provide the required proof, and the $ 5,000 per day fine in the event of its failure to do so, shall run from the date of finality of this court's judgment. Costs of the appeal, including the Commission's attorney fees, are assessed to Elio.
AFFIRMED IN PART; REVERSED IN PART.

La. Admin. Code, Title 46, Part V, § 303(A).

The term "recreational product" includes motorcycles. La. R.S. 32:1252(45). The term "motorcycle" includes three-wheeled vehicles. § 1252(30).

A licensee is any person who is required to be licensed by the Commission. La. R.S. 32:1252(22).

This type of vehicle is sometimes referred to as an "autocycle," but that term is not used in the licensing law. As noted above, Elio's vehicle fits the statutory definition of a recreational product.

It is unclear whether this press release was issued in January 2013 or in January 2014. Both dates appear on the release.

An asterisk appeared next to the price, indicating that the figure listed was the "MSRP [manufacturer's suggested retail price] for non-refundable reservations only and applies only until non-refundable and refundable reservations total 65,000."

The asterisk next to the price referred the reader to the same qualifying language noted above.

Another tenant was using other space at the plant for purposes unrelated to Elio's business, according to the Commission's May 2017 investigative report.

La. Admin. Code, Title 46, Part V, § 1901.

La. R.S. 49:958 states in part: "A final decision or order adverse to a party in an adjudication proceeding shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings. If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling upon each proposed finding...."

The district court stated that the manifest error standard of review applied to its review of the Commission's factual findings. This statement is no longer accurate in light of the current wording of Subsection 964(G)(6), which directs a reviewing court to determine whether the decision under review is supported by a "preponderance of the evidence." The manifest error standard appeared in a prior version of that subsection.

The Commission initially alleged that Elio was a "motor vehicle" manufacturer and dealer, but later added allegations that Elio is a "recreational products" manufacturer and dealer. The agency and the district court found Elio to be a recreational products manufacturer and dealer. Elio disputes its status as either a manufacturer or a dealer but does not dispute that its vehicle is a recreational product.

No exception has been asserted here. As noted above, Elio's vehicle fits the statutory definition of a motorcycle, which is one type of recreational product. La. R.S. 32:1252(30), (45).

Women's and Children's Hosp. v. State, Dept. of Health and Hospitals , 08-946 (La. 1/21/09), 2 So.3d 397, 402.

An adjudication proceeding before the Commission, including the formal hearing, is less formal than a judicial proceeding. It is not subject to strict rules and technicalities, but must be conducted in accordance with considerations of fair play and constitutional requirements of due process. La. Admin. Code, Title 46, Part V, § 303(A).

La. R.S. 49:960(B) permits any party to request the disqualification of a subordinate deciding officer or agency member on the ground of his inability to give a fair and impartial hearing "by filing an affidavit, promptly upon discovery of the alleged disqualification, stating with particularity the grounds upon which it is claimed that a fair and impartial hearing cannot be accorded. The issue shall be determined promptly by the agency, or, if it affects a member or members of the agency, by the remaining members thereof[.]"

The record does not support Elio's contention that Mr. LaPeyronnie participated in the investigation and prosecution of this case.

The law authorizes penalties of up to $ 5,000 per day for each violation.